UNITED STATES of America,
Plaintiff-Appellant,

v.

EIGHTY–NINE (89) BOTTLES OF "EAU DE JOY," "100," "Eau de Patou," "Joy," "Caline," and "Eau de Caline" Perfumes, Defendants,

and

Jacqueline de Nola, Intervenor-Appellee.

No. 85–2007.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1986.

Decided Aug. 18, 1986.

Lynn K. Richardson, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellant.

Joseph L. Strabala, San Francisco, Cal., for defendants and intervenor-appellee.

Before NELSON, CANBY and NOO-NAN, Circuit Judges.

CANBY, Circuit Judge:

This is a civil *in rem* action in which the United States sought forfeiture of some perfumes it contends were imported in violation of the Tariff Act of 1930, 19 U.S.C. § 1526(a) (1982). Upon a motion from intervenor de Nola, the district court granted summary judgment for defendant perfumes; it denied the government's summary judgment motion. The government appeals, and we now reverse.

## BACKGROUND

Intervenor Jacqueline de Nola owns and operates a San Francisco perfume store known as the Jacqueline-St. Francis Perfume Shop. In 1979, the store stocked several lines of perfume products manufactured and trademarked by Jean Patou Parfumeurs, S.A. of Paris, France ("Patou-Paris").

Jean Patou, Inc., a New York corporation ("Patou-New York"), owns domestic trademarks and exclusive distribution rights on Patou-Paris products in the United States. Patou-New York is a subsidiary of Borden, Inc., a New Jersey corporation; it has no ownership or operational ties to Patou-Paris beyond the distributorship agreement between them. Generally, Patou-Paris products enter the United States in New York. There, Patou-New York affixes its label and distributes the products to various retail outlets.

The Patou-Paris products sold at de Nola's store did not enter the United States in this manner. Instead, de Nola acquired genuine Patou-Paris products from an authorized Patou-Paris distributer in Europe. She then imported the perfumes herself, thereby avoiding any dealings with Patou-New York.[1] All perfumes imported by de Nola were properly declared, and applicable Customs duties were paid.

De Nola's arrangement, which the government characterizes as "grey-market" dealing, was discovered when Patou-New York President Richard Lockman visited de Nola's store in July 1979 and observed that Patou-Paris products without his company's label were being sold. Lockman lodged a complaint with U.S. Customs.

Because trademarked goods were apparently being imported without the consent of the American trademark holder, the Customs Service issued two notices of redelivery. De Nola complied with the notices, returning to Customs 89 bottles of perfume plus $4016, which represented the value of perfumes subject to the redelivery order but already sold. The government then instituted this forfeiture proceeding against the property.

In its motion for summary judgment, the government charged that de Nola's importation of the Patou-Paris products violated 19 U.S.C. § 1526(a). That statute provides, in pertinent part:

[I]t shall be unlawful to import into the United States any merchandise of foreign manufacture if such merchandise ... bears a trademark owned by ... a [United States] corporation ..., unless written consent of the owner of such trademark is produced at the time of making entry.

De Nola contested the statute's application on two grounds. First, she argued that the importation was within an exception to section 1526(a) recognized by the Customs Service. Under the exception, section 1526(a) is inapplicable when the owners of the foreign and domestic trademarks are subject to "common control." 19 C.F.R. § 133.-21(c)(2) (1985). Regulations define "common control" as "effective control in policy and operations." 19 C.F.R. § 133.2(d)(2) (1985). Although de Nola never alleged that Patou-New York and Patou-Paris shared common ownership, operations or management, she claimed that Patou-Paris

---

1. De Nola had attempted to secure a distribution agreement with Patou-New York on several occasions, but for undisclosed reasons Patou-New York refused to do business with her. The record indicates that de Nola threatened legal action over what she characterized as Patou-New York's unlawful boycott of her operation.

exercised effective control over Patou-New York's operations because Patou-Paris was wholly responsible for product manufacture and quality control. The district court rejected the argument.

The court granted judgment for defendants on the basis of de Nola's second argument—that section 1526(a) was inapplicable because the goods de Nola sold were "genuine" Patou-Paris products. The concern Congress sought to address, she argued, was pirated or unauthorized copies of foreign products. So long as the goods are genuine, no danger exists that the public would be deceived. Further, she argued that the genuineness of the goods prevented a private infringement action under section 42 of the Lanham Act, 15 U.S.C. § 1124 (1982), and that Patou-New York should not be permitted to do indirectly through the Tariff Act what it could not do under the trademark laws. The district court agreed.

## DISCUSSION

### I. *Forfeiture of Genuine Goods under 19 U.S.C. § 1526*

The primary issue in the case is narrow: whether genuine goods imported into the United States, without permission of the domestic trademark owner, are subject to forfeiture under 19 U.S.C. § 1526. This is a question of statutory interpretation, subject to *de novo* review. *Southeast Alaska Conservation Council, Inc. v. Watson,* 697 F.2d 1305, 1309 (9th Cir.1983).

A number of federal courts have had occasion recently to explore the scope of section 1526(a). *See, e.g., Olympus Corp. v. United States,* 792 F.2d 315 (2d Cir. 1986); *Coalition to Preserve the Integrity of American Trademarks v. United States,* 790 F.2d 903 (D.C.Cir.1986) (*"COPI-AT"*); *Vivitar Corp. v. United States,* 761 F.2d 1552 (Fed.Cir.1985) (five-judge panel), *cert. denied,* — U.S. —, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *Weil Ceramics &*

*Glass, Inc. v. Dash,* 618 F.Supp. 700 (D.N. J.1985); *Osawa & Co. v. B & H Photo,* 589 F.Supp. 1163 (S.D.N.Y.1984); *Bell & Howell: Mamiya Co. v. Masel Supply Co.,* 548 F.Supp. 1063, 1079 (E.D.N.Y.1982), *vacated and remanded,* 719 F.2d 42 (2d Cir.1983). These cases have generally involved challenges to the "common ownership or control" exception to section 1526(a) recognized by the Customs Service, *see* 19 C.F.R. § 133.21(c)(1)–(2) (1985), rather than questions about the scope of section 1526(a) as such.[2]

In the course of considering the regulations, however, several courts have explored the legislative history of section 1526(a) in considerable detail. *See COPI-AT,* 790 F.2d at 908–16; *Vivitar,* 761 F.2d at 1561–65; *Osawa,* 589 F.Supp. at 1175–78; *Bell & Howell,* 548 F.Supp. at 1072–78; *see also Weil Ceramics,* 618 F.Supp. at 714–15. Although the courts do not agree on the validity of the regulations, *see COPIAT,* 790 F.2d at 904–05, the cases all recognize that Congress intended to make genuine goods excludable under section 1526 unless the American trademark owner consents to their importation. An argument to the contrary at this point is simply untenable.

■ We need not duplicate the lengthy historical review of section 1526(a) already published by other courts. Suffice it to say that we have independently explored the historical record, and we agree with the interpretations rendered by the District of Columbia and Federal Circuits and several district courts. There can be no question that Congress intended section 1526(a) to bar the importation of genuine goods unless authorized by the domestic trademark owner. *See, e.g., COPIAT,* 790 F.2d at 910–13; *Vivitar,* 761 F.2d at 1563; *accord Olympus Corp.,* 792 F.2d at 319–20.

The district court refused to grant forfeiture here because it did not believe it could permit Patou-New York to do through the

---

**2.** The validity of the regulations is not before us in this appeal. We, of course, express no view on the issue.

Tariff Act what it could not do through the Lanham Act. The legislative history of section 1526(a), however, shows that Congress intended just that result. It believed there was a loophole in the nation's customs laws, under which Americans owning legitimate trademark interests granted by foreign manufacturers were not permitted the full benefit of those trademark rights.[3] American trademark owners were already protected against imports of counterfeit goods by provisions in the trademark laws. *See* 15 U.S.C. § 1124 (unlawful to import goods that "copy or simulate" trademarked goods); *see also* Trade Mark Act of 1905, ch. 592, § 27, 33 Stat. 730 (predecessor statute). Far from being inapplicable to genuine goods, the statute was directed toward those goods in particular. *See, e.g., COPIAT,* 790 F.2d at 910–13.

Additional evidence supports this conclusion. For example, 48 U.S.C. § 1643 (1982) exempts from section 1526's restrictions importations into the Virgin Islands. The statute reads, in pertinent part:

> [S]ection 1526 of Title 19[ ] shall not apply to importations into the Virgin Islands of genuine foreign merchandise bearing a genuine foreign trade-mark, but shall remain applicable to importations of such merchandise from the Virgin Islands into the United States or its possessions....

This language clearly indicates that Congress considers genuine goods excludable under section 1526. *See Weil Ceramics,* 618 F.Supp. at 715. Congress's 1978 enactment of section 1526(d), exempting items imported for personal use, also suggests a general rule of exclusion for genuine goods.

In light of all this evidence, we must conclude that genuine goods are subject to forfeiture under section 1526 when they are imported without permission of the domestic trademark owner. The district court erred when it held otherwise.

## II. *The Common Control Exception to 19 U.S.C. § 1526*

In the district court, de Nola argued that this case was within the "common control" exception to section 1526 recognized by the Customs Service. *See* 19 C.F.R. §§ 133.-21(c)(2), 133.2(d)(2). The district court rejected the argument. On appeal, de Nola appears to challenge this ruling although she took no cross-appeal.[4]

The regulatory language makes clear that it contemplates the sort of control that a parent corporation would exercise over a subsidiary or that a common owner might exercise over both organizations. *See Coalition to Preserve the Integrity of American Trademarks v. United States,* 598 F.Supp. 844, 849–50 (D.D.C. 1984), *rev'd on other grounds,* 790 F.2d 903 (D.C.Cir.1986). The Customs Service has interpreted the regulation in this manner for nearly 35 years. Its view, which is entitled to deference from this court, *see Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 39, 102 S.Ct. 38, 45, 70 L.Ed.2d 23 (1981), is that if the domestic and foreign trademark owners are really the same entity, "articles produced and sold abroad by the foreign owner may be imported by any-

---

**3.** We note that subsequent to the enactment of section 1526, the Supreme Court held that the sale of genuine goods could constitute trademark infringement and that what is now section 42 of the Lanham Act required exclusion of such goods from the United States. *A. Bourjois & Co. v. Aldridge,* 263 U.S. 675, 44 S.Ct. 4, 68 L.Ed. 501 (1923) (per curiam) (answering questions certified in *A. Bourjois & Co., Inc. v. Aldridge,* 292 F. 1013, 1014 (2d Cir.1922) (per curiam)); *see also Vivitar,* 761 F.2d at 1564. Thus, the district court's statement that de Nola's sale of genuine Patou-Paris products could not support an infringement action under the Lanham Act may be incorrect as well. *But see Olympus Corp. v. United States,* 792 F.2d 315, 321 (2d Cir.1986). As the issue is not raised by the parties and is unimportant to the decision in this case, we express no view on this question.

**4.** We emphasize once more that the Customs Services' power to enforce these regulations is not now before us. *See supra* note 3.

one since the trademark owner has itself either introduced or authorized the introduction of the articles into commerce and thereafter may not unreasonably restrict the use of the product." *COPIAT*, 598 F.Supp. at 850 (citing five Customs Service Policy Letters). As it is undisputed that Patou-Paris and Patou-New York are not related corporations and do not share common ownership, operations or management, the district court ruling on this issue was correct. *Cf. Bell & Howell*, 548 F.Supp. at 1079 (exception inapplicable where foreign firm owned only seven percent of the American firm stock and exerted no control over the domestic company's policies or operations).

■ We can find nothing to support de Nola's contention that the regulation applies where the relationship between the foreign and domestic trademark owners is essentially one of licensor-licensee. Instead, the Customs Service applies its exception when the foreign and domestic entities are sufficiently connected that either firm can effectively control the introduction of goods into the stream of international commerce. The undisputed facts show that there is no such connection here.

### CONCLUSION

The judgment of the district court is reversed, and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.